IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ADAME,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>BANK OF AMERICA, NATIONAL ASSOCIATION,<br><br>　　　　Defendant.<br>_____/ | No. C 09-00129 SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO RICHARD ADAME** |

On July 30, 2010, the Court held a hearing on defendant's motion for summary judgment as to plaintiff Richard Adame. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

Plaintiff Richard Adame is a fifty-eight-year old Mexican-American male. He is fluent in both Spanish and English, and prior to his demotion by defendant and subsequent resignation, had worked in the mortgage banking industry for over twenty years. Adame Decl. ¶¶ 2, 7. Adame began his career in 1986 as a wholesale banking executive for Unified Mortgage. *Id.* ¶ 9. In 1996, he was hired as a sales manager by then-Regional Executive Charles Putris to work in defendant Bank of America's (the "Bank's") Pleasanton sales office. Between 1996 and 2000, plaintiff increased the staff of defendant's Pleasanton office from five mortgage loan officers ("MLOs") to fifteen, and increased the office's annual loan volume from $60 million to $300 million. Adame Decl. ¶ 13. As a result, plaintiff was promoted, received numerous awards, and his compensation increased, including a $128,000 bonus in 1999 for his outstanding performance. *Id.* ¶¶ 13-22.

As Sales Manager, Adame supervised a team of MLOs who dealt directly with consumers. Thompson Decl. ¶ 3. Individual offices were grouped into geographical regions, which were led by "regional executives." *Id.* In the Northern California Region, in which Adame worked, the regional manager was assisted in overseeing regional affairs by Regional Coordinator Nancy Chambard. Sales managers were expected to meet certain monthly goals set by the Bank's National Team at the beginning of each year. Thompson Decl. ¶ 10. In 2007, these goals included the attainment of a specified second mortage/home equity line of credit ("HELOC") volume; the sale of Buyers' Protection Plans ("BPPs") with at least 17 percent of eligible loans; the recruitment of top-performing MLOs from other financial firms; and a specified MLO productivity. Thompson Decl. ¶¶ 15-17. The HELOC goal was based upon the number of a sales manager's MLOs who produced at least two HELOC applications per month, *id.* ¶ 15, and MLO productivity measured the percentage of a sales manager's MLOs who met their monthly goals. Thompson Dep.[1] at 82:13-90, 91:11-92:5. Bank of America expected sales managers to ensure that their MLOs were meeting their individual monthly goals for collecting loan applications. Thompson Decl. ¶ 10.

In 1997, Bank of America began its association with ACORN, a loan program for low-income borrowers that the Bank sought to market especially to low-income minority communities. Adame Decl. ¶ 27. ACORN loans were less profitable than other loans because they had less restrictive qualification criteria and were partially subsidized by the Bank. Thompson Decl. ¶ 19. In addition, ACORN loans were not eligible for BPPs or HELOCs. *Id.* Adame was recruited by another bank in 2000, but was asked to return to Bank of America by Charles Putris, the Regional Executive of the Northern California Region, in 2002 to run the Bank's San Jose office. At the time, the Bank was interested in increasing its sales of ACORN loans and believed Adame would be especially effective in marketing these loans to the largely Hispanic East San Jose population on account of both his cultural ties to the local community and his fluency in Spanish. Adame Decl. ¶¶ 24-53. Adame successfully

---

[1] All depositions cited hereinafter are attached in relevant part as exhibits to either the Declaration of Randall Strauss in Opposition to Defendant's Motion for Summary Judgment (Docket No. 80), or the Declaration of Lena Ryan in Support of Defendant's Motion for Summary Judgment, (Docket No. 67).

expanded the ACORN sales volume, and both the Bank and Putris were pleased with his performance. *Id.*; Putris Dep. at 53:23-64:13.

In early 2007, however, the Bank began to change the criteria for ACORN loans and stressed the need for sales managers to sell a greater variety of bank products. Thompson Decl. ¶ 20. During the same period in early 2007, Ann Thompson, a fifty-year old Caucasian female, began working in the Northern California Region as one of the Bank's "builder representatives." Adame claims that from this period onward, Thompson exhibited racial and age-based animus towards him. Adame claims that he learned through sales manager Bill Quinn that shortly after Thompson began working in the Northern California Region, Thompson made negative comments about plaintiff's communication and managerial abilities, even though she had never met him in person. Adame Decl. ¶¶ 55-59. In an effort to resolve any concerns Thompson might have with his performance, Adame invited her to give a presentation to the San Jose sales office, hoping that he might have a discussion with her afterwards. Adame Decl. ¶ 59. Adame claims that after her March 2007 presentation, Thompson treated him and his staff rudely, and allegedly contrary to custom, left abruptly without fielding any questions. Adame Decl. ¶¶ 59-62.

In March 2007, Putris advised Adame for the first time that the Bank wanted the region to reduce its dependence on ACORN loans and focus its efforts on the sale of higher-end loans instead. Adame Decl. ¶¶ 63-69. In May 2007, Thompson was made the Northern California Regional Executive. *Id.* ¶ 70. Adame claims that upon arriving at the meeting in which Thompson was formally introduced to the Northern California sales managers, he noticed a group of sales managers crowded around Thompson; she was "talking to them in an animated fashion and was freely embracing, hugging, and kissing each person on the right and left cheek." *Id.* ¶ 71. Adame claims that as he approached her, expecting to receive the same treatment, he instead received what did not even amount to a full handshake. *Id.* ¶ 72. Adame states, moreover, that he was struck by the "look of disgust" on Thompson's face as she grasped his hand. *Id.* ¶ 74. During the meeting, he claims that Thompson avoided eye-contact with him and declined to acknowledge him and allow him to contribute to the meeting each time he raised his hand. *Id.* ¶¶ 77-78. Adame also testifies that during one of the breaks, he spoke to plaintiff C. George Bender, an African American sales manager, about this incident and

3

discovered that Bender had experienced similar treatment.[2] *See id.* ¶ 75; Bender Decl. ¶¶25-29. Both Bender and Adame claim that they were treated differently than non-minority sales managers on account of their race.

In May 2007, Thompson gave plaintiff guidance on how to diversify his office's loan portfolio and reduce its dependence on the issuance of ACORN loans. Adame Dep. at 245:1-15; Ryan Decl. ¶ 10, Ex. I. Thompson also encouraged plaintiff to build more business alliances with real estate firms, which would create more opportunities to sell non-ACORN loans. Adame Dep. 245:1-251:3; Ryan Decl. ¶¶ 10-11, Exs. I, J. In addition, Thompson invited plaintiff to play a significant role in a golf tournament held by Intero, a real estate firm that had an alliance with the Bank, in order to help him establish more contacts. Adame Dep. at 312:14-316:10; Ryan Decl. ¶ 15, Ex. N.

On June 6, 2007, Nancy Chambard told Adame to meet with her and Thompson at the Palo Alto sales office. Adame Decl. ¶ 79. Adame claims that he understood the purpose of the meeting was to discuss ways to adapt to the rapidly declining real estate market. *Id.*¶ 79. He claims that "[n]obody provided any feedback or comments on what I said," and that, on the contrary, Thompson told him to "[k]eep doing what you're doing." *Id.* ¶¶ 83-84. Plaintiff claims that he left the meeting with no knowledge that the Bank's progressive discipline process had been initiated against him.[3] *Id.* Thompson, on the other hand, maintains that the June 6, 2007 meeting constituted a verbal warning under Bank of America's progressive discipline guidelines. Adame Decl. ¶ 106.

After the meeting, plaintiff claims that he received no coaching or any type of assistance that would indicate that he received a verbal warning. Bank of America disputes this claim and has proffered evidence that subsequent to the June 6 meeting, plaintiff provided Thompson with an "action plan" for his office, to which she responded with comments on June 18, 2007. Thompson Dep. at

---

[2] Defendant objects to this evidence as hearsay. Although Bender's statement to Adame is hearsay, plaintiff Bender's own statement about how he felt Thompson treated him is not.

[3] The Bank's progressive discipline guidelines provide that in cases in which an employee is not meeting his goals, his manager should first issue a verbal warning, and actively coach him on ways to improve his performance. In the event of non-improvement, the manager should, after consultation with Advice and Counsel, draft a written warning identifying plaintiff's deficiencies and what he must do to improve. Finally, if the employee still does not improve, the manager should, after consultation with Advice and Counsel, issue a "final written warning," after which, failure to improve performance may be punishable by termination. *See* Chambard Dep. at 63:1-69:25; Rhine Dep. at 69:1-72:25.

4

298:16-200:25; Ryan Decl. ¶ 12, Ex. K. In addition, in July 2007, Thompson counseled plaintiff that he needed to improve his office's BPP, MLO productivity, and second mortgage/HELOC metrics. Pl.'s Dep. at 248:13-250:8; Ryan Decl. ¶ 11, Ex. J.

Adame claims that in June 2007, Thompson also excluded him from the PFUN[4] program. Thompson describes PFUN as "a system of points that allowed an MLO to lower the interest rate on a mortgage loan to meet a competitive rate without hurting his or her commission up to a certain point." Thompson Decl. ¶ 29. Adame claims that because his office was being forced to reduce its sales of ACORN loans in the predominantly low-income region of San Jose, Thompson's failure to include him in this program unfairly constrained his ability to diversify the San Jose office's portfolio, and that this decision was motivated by racial animus. *Id.* Thompson states that only three of the thirteen offices (Palo Alto, Foster City, and San Francisco) in her region were permitted to participate in the program, and that many Caucasian sales managers were also not selected. She asserts, moreover, that participation in PFUN was actually a disadvantage and "not necessarily a good thing" because the pilot limited PFUN use and was a "bigger hit to the loan officers." Thompson Dep. at 125:2-23; Thompson Decl. ¶ 29.

Adame claims that at an August 2007 sales meeting, Thompson admonished plaintiff Connie Davis, an African American, for soliciting business outside of her territory, and instructed her to "stay in your hood." Adame, Davis, and Bender all discussed this after the meeting, and each regarded it as offensive. Adame Decl. ¶¶ 100-01. At a dinner held after this meeting, Ralph Mariano, the Palo Alto sales manager, expressed to Adame that he knew Adame was not like "those other people," while shifting his gaze to plaintiffs Bender and Davis. He then informed Adame that if Adame fired a minority MLO he had hired, "all would be well with Ann [Thompson]." *Id.* ¶ 103.

On August 24, 2007, Thompson issued a written warning to plaintiff, which specified that Adame was expected to exhibit "immediate and sustained improvement" in HELOC volume, MLO productivity, and BPP sales. Pl.'s Dep. at 339:14-361:18; Ryan Decl. ¶ 17, Ex. B. When Adame expressed his surprise at receiving a written warning because he was unaware that he had received a

---

[4] The parties do not define this acronym.

5

verbal warning, Thompson informed him that the June 6, 2007 meeting constituted a verbal warning, and requested that he sign a written acknowledgment to that effect. Adame Decl. ¶ 106. Adame contends that he signed the document under duress, fearing termination for insubordination if he refused. Although the written warning initially mandated a BPP sales rate of 17% and an MLO productivity of 70%, Thompson agreed to Adame's request to lower the expected MLO productivity to 50%, and to find merely an "upward trend" in BPP sales sufficient. Adame Decl. ¶ 108; Ryan Decl. Ex. P.

On September 19, 2007, less than one month after issuing the initial written warning, Thompson and Chambard went to Adame's office and served him with a final written warning. The final warning mandated that if Adame did not meet his goals by the end of the month, he faced potential termination. According to Adame, this demand was impossible to satisfy, and when he asked Thompson if she was looking to have him out by the end of the month, "[s]he just looked at me and smirked." Adame Decl. ¶ 118. At this point, Chambard suggested Adame would make a good loan officer, and that if he signed the final warning and stepped down as sales manager, they could arrange for his transfer. *Id.* ¶ 120. During the meeting Thompson also stated multiple times that Adame "lacked energy." Adame claims that this is indicative of ageist animus.

Adame claims that Thompson improperly applied the Bank's progressive discipline guidelines, and that he was treated more severely than similarly situated Caucasian employees. He asserts that because loans take sixty to ninety days to be approved, it would take at least that long to exhibit improvement after receiving a warning. Adame Decl. ¶¶ 97-100; Thompson Decl. ¶ 14. For this reason, he claims that Thompson's issuance of his final written warning less than 30 days after the initial warning, and the eleven day deadline for improvement contained in the final warning, were patently unreasonable and designed as a pretext to fire him. While defendant claims that Adame's performance did not improve materially between June and September, evidence submitted by both parties indicates that Adame's MLO productivity increased from 46.8 percent to 48.8 percent, and that the proportion of low-income loans sold by his office fell from 23.6 to 23 percent. Thompson Decl., Exs. B, C. However, the percentage of the overall sales goal met by Adame fell from 111.1 percent to 79.7 percent between the second and third quarters. *Id.*

Plaintiff claims, and Nancy Chambard has testified, that employees are entitled to at least 30

6

days between disciplinary steps. Chambard Dep. at 65:17-67:12. According to Chambard, sales managers need only show incremental growth over a period of time in order to save their jobs. Chambard Dep. 81:2-85:9. Moreover, although she was present at the June 6, 2007 meeting with plaintiff, when asked, she could not recall if she had ever been present for the issuance of any verbal warning to Adame. Chambard Dep. at 63:7-16. Thompson has also acknowledged the ambiguity of verbal warnings in general. When asked whether an underperforming Caucasian sales manager had been issued a verbal warning when she coached him and asked him to submit an action plan, Thompson replied, acknowledging the similarity to Adame's case, "He was coached verbally. I don't know if it was a verbal warning, but yes, similar document and similar discussions." Thompson Dep. 341:15-20. Diana Rhine of the Bank's Advice and Counsel Department has testified that written warnings generally do not include specific time frames, and that the imposition of an unreasonable goal is improper. Rhine Dep. at 70:6-16; 101:2-107:13. Thompson claims, on the other hand, that the progressive discipline guidelines were intended specifically for MLOs, and that while she generally applied progressive discipline to sales managers (except in extreme cases or for ethics violations), it was nevertheless her prerogative to take whatever action she deemed fit. Thompson Dep. at 44:18-53:6; 63:25-65:18.

Plaintiff stepped down from his position as sales manager on October 1, 2007, and was replaced by Craig Stinnett, a forty-three-year old Caucasian male. Adame began working once again for Putris as an MLO at the Bank's Sunnyvale office, and claims that during this period he learned from Putris that Thompson had told his replacement, Stinnett, that "[a] monkey could have run this office better than Richard Adame." Thompson denies that this statement was ever made. Thompson Dep. at 291:24-292:2. Stinnett declares that "does not recall" Thompson making such a statement. Stinnett Decl. ¶ 6.

On October 23, 2007, plaintiff filed a complaint with Bank officials claiming, *inter alia*, that Thompson discriminated against him, and requesting to be reinstated as sales manager. Plaintiff's complaint was forwarded to the Advice and Counsel Department, where it was investigated by Diana Rhine. Rhine Dep. at 98:4, 183:2-7, Ex. 18. Rhine interviewed Adame and Thompson, and based on their statements concluded that Adame's claim was unfounded. Rhine did not interview Bender, Davis, Putris, Stinnett, Mariano, or Quinn. Rhine Dep. at 114:24-123:11; 188:4-195:25. Plaintiff alleges that the investigation was inadequate and that Bank of America did not take his claims seriously.

Defendant contends that after stepping down as sales manager, plaintiff underperformed as a MLO. However, according to Putris, while plaintiff was working as a MLO, he was "doing pretty good." Putris Dep. at 166:5-15. In March 2008, plaintiff, who claims he was seeking a "fresh start," voluntarily stepped down from his MLO position and began working for Nick Mathe as a "reverse mortgage loan officer" ("Reverse MLO"). Adame Dep. at 185:1-187:13. Plaintiff claims that the Bank's failure to adequately investigate his complaint led to a decline in his performance. *See* Adame Dep. at 201:4-6. In October 2008, Mathe verbally counseled plaintiff for his poor performance as a Reverse MLO. *Id.* at 205:18-208:22. Because plaintiff failed to improve, in November 2008, Mathe issued him a written warning. *Id.* In December 2008, after plaintiff again failed to improve, Mathe issued plaintiff a final written warning, and ultimately gave plaintiff the option to retire rather than face termination. Adame Dep. at 184:16-184:25, 209:24-210:19.

Plaintiff claims that he "was forced to resign" because he found "the Bank's refusal to do anything at all about Ann Thomspson's blatant, malicious, and hostile discriminatory treatment towards [him] and other minority sales managers . . . extremely disheartening." Adame Decl. ¶ 133; *see also* Adame Dep. at 209:24-210:19. Plaintiff alleges that the Bank's failure to dispose of his claim led to his depression, which in turn affected his performance as Reverse MLO, and led to the Bank's adverse action (retaliation) that forced his retirement.

Based on the foregoing, plaintiff Adame has alleged claims for (1) race discrimination in violation of 42 U.S.C. § 1981; (2) violation of Title VII of the Civil Rights Act of 1964 (race discrimination by an employer); (3) violation of the Age Discrimination in Employment Act ("ADEA"), (4) race and age discrimination in violation of the California Fair Employment and Housing Act ("FEHA") (Cal. Gov't Code § 12940 *et seq*); (5) FEHA harassment based on race and age (Cal. Gov't Code § 12940 *et seq*); (6) FEHA retaliation (Cal. Gov't Code § 12940 *et seq*.); (7) wrongful termination/demotion/retaliation in violation of public policy; and (8) defamation. Plaintiff alleges that Thompson alone discriminated against him, and alleges no claims against Putris or Mathe for action taken subsequent to his demotion. Defendant has moved for summary judgment on all of Adame's claims.

**LEGAL STANDARD**

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. See *T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I. Section 1981, FEHA, and Title VII race discrimination claims and FEHA failure to prevent discrimination claim**

Defendant moves for summary judgment on Adame's race discrimination claims under 42 U.S.C. § 1981, the California Fair Employment and Housing Act ("FEHA") and Title VII, as well as Adame's claim for failure to prevent discrimination under FEHA. Since the analyses required for § 1981, Title VII, and FEHA claims are substantially the same, the Court analyzes them concurrently. *See, e.g., Brooks v. City of San Mateo*, 229 F.3d 917, 923 n.3 (9th Cir. 2000); *Beyda v. City of Los Angeles*, 65 Cal. App. 4th 511, 516-17 (1998); *see also Fonseca v. Sysco Food Servs. of Arizona, Inc.*,

374 F.3d 840, 850 (9th Cir. 2004). Under the *McDonnell Douglas* burden-shifting framework, to mount a successful Title VII claim, a plaintiff must first establish a *prima facie* case of unlawful discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). The burden then shifts to the employer to proffer a legitimate, nondiscriminatory rationale for its action. *Id.*; *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122-23 (9th Cir. 2004). If the employer does so, then the plaintiff must show that the nondiscriminatory reason is pretextual in order to prevail. *McGinest*, 360 F.3d at 1122.

Although defendant concedes for purpose of this motion that plaintiff makes a *prima facie* case for race discrimination, defendant claims that plaintiff has not met and cannot meet his burden in showing that defendant's legitimate non-discriminatory reason for terminating plaintiff – namely, that "plaintiff was not meeting his goals and that on several of his assigned metrics, his branch was performing at the lowest level in the region" – was pretextual. Def.'s Mot. at 19:2-3. Defendant argues that plaintiff's failure to prevent discrimination claim likewise fails on the ground that defendant cannot show he was subject to racial discrimination.

In response, plaintiff contends that he was treated differently from similarly situated non-minority sales managers. Plaintiff has submitted evidence that could support the inference that Thompson applied the progressive discipline policy differently to Adame than she did to similarly situated Caucasian employees. Specifically, Adame testified that he did not know he was being "verbally warned" at the June 6, 2007 meeting, and thus that his job was imperiled. Chambard also testified that despite the fact she was present at the June 6 meeting, she has no recollection of ever being present for the issuance of any verbal warning. Thompson herself likewise acknowledged the ambiguity surrounding the issuance of verbal warnings and testified that a similarly situated Caucasian who received counseling was not verbally warned. Chambard also testified that a record of the issuance of a verbal warning should always be kept. It is undisputed that no contemporaneous record was made to document a verbal warning on June 6, 2007. Instead, it was not until August 24, 2007 that Thompson demanded that Adame sign an acknowledgment that the June 6 meeting constituted his verbal warning.

The deposition testimony of Rhine, Chambard, and Putris also suggests that Thompson's imposition of a deadline for plaintiff to meet expectations within fewer than thirty days in a field where it takes sixty to ninety days for such improvement to manifest was potentially both unreasonable and

10

improper. Rhine's testimony likewise suggests that the increase in plaintiff's MLO productivity should have halted the discipline process. Thompson states in her testimony, by contrast, that although some Caucasian sales managers supervised by her had performance issues, they were given ample coaching, and did not receive a written warning. *See* Thompson dep. 203:3-205:4.

The Bank asserts that Thompson did in fact follow the progressive guidelines, even though she was not at all obliged to, and that it was entirely her prerogative to specify a time frame in which to meet the goals set at the national level. Thompson, Rhine, and Chambard all state in their testimony that the written warnings should be drafted in consultation with Advice and Counsel (which Thompson claims she did), and that the ultimate disciplinary remedy should be tailored to the circumstance, which the regional executive knows best. Moreover, the Bank argues that the standard to which Thompson was holding Adame was not implemented during her tenure as regional executive, but rather during Putris', against whom Adame does not assert a race discrimination claim. However, the fact that Thompson had discretion to terminate plaintiff according to the method and process of her choice is irrelevant. The dispositive question is whether the process she employed in disciplining Adame differed from the general process employed by the Bank because of his race, and plaintiff's evidence, even if inconclusive, is nevertheless sufficient to support such an inference of discrimination by a reasonable juror at trial.

Although summary judgment could be denied on the basis of the foregoing alone, material factual controversies also exist as to other circumstantial evidence. Plaintiff Adame and Bender's testimony that Thompson refused to exchange the same warm social pleasantries (hugging, kissing on the cheek, etc.) with them as their Caucasian counterparts, combined with her alleged deliberate refusal to acknowledge plaintiffs while acknowledging the other (Caucasian) sales managers at meetings conflicts directly with that of Thompson, who counters she treated Adame, Bender, and Davis with the same respect. Finally, Thompson denies ever saying, and Stinnett "does not recall" ever hearing or recounting to Putris, Thompson's alleged statement that a monkey could run the San Jose office better than Adame. This directly contradicts the sworn testimony of both Putris and Adame.[5] Thus, viewing

---

[5] The Court addresses defendant's hearsay objection *infra*.

the evidence in the light most favorable to the plaintiff, the Court finds that these factual discrepancies, could conceivably be resolved in favor of the plaintiff by the trier of fact, thereby permitting the inference that plaintiff's termination/demotion was motivated by racial animus. Accordingly, the Court DENIES defendant's motion for summary judgment as to plaintiff's § 1981, Title VII, and FEHA race discrimination claims. The Court also DENIES defendant's motion for summary judgment as to plaintiff's failure to prevent racial discrimination claim.

**II.     Age discrimination claims**

Defendant moves for summary judgment on plaintiff's claims for age discrimination under FEHA and ADEA. In order to make out a *prima facie* claim for age discrimination under these statutes, plaintiff must demonstrate that (1) he is age 40 or older, (2) he was performing his job adequately, (3) he suffered an adverse employment action, and (4) he was replaced by a younger worker or terminated under some other circumstance supporting the inference of an improper, discriminatory motive. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (ADEA); *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 353 (Cal. 2000) (FEHA).

Plaintiff is fifty-eight years old, claims he performed his job adequately, was given two written warnings by Thompson, and was replaced by Stinnett, a Caucasian male fifteen years his junior. Thus, there is no question that plaintiff has stated a *prima facie* case for age discrimination. Defendant, however, asserts that plaintiff performed his job inadequately, and points to his failure to meet his goals on several metrics as a legitimate reason for his dismissal, thus shifting the burden of proof to plaintiff. Although plaintiff submitted evidence to show that he was treated differently than similarly situated Caucasian employees, the Court finds that he has submitted no evidence that he was treated differently than similarly situated younger employees. In fact, eleven of the Northen California sales managers were over forty, and sales managers older than plaintiff were not terminated, while plaintiff Davis, who is younger than Adame, was. Bush Decl. ¶¶ 3-4. Accordingly, plaintiff fails to show that defendant's proffered legitimate reason for firing him was merely a pretext.

The only evidence plaintiff provides in support of his age discrimination claim is his testimony that Thompson told plaintiff on one occasion that he "lacked energy." Pl.'s Dep at 408:18-410:11. But

1  this comment did not refer to plaintiff's age, and there is no evidence to suggest that it was even related
2  to his age. Rather, as other courts have found, it is more appropriately viewed as an ambiguous and
3  stray remark insufficient as a matter of law to establish a claim for age discrimination. *See Nidds v.*
4  *Schindler Elevator Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1996) (supervisor's comment that he wanted
5  to get rid of the "old timers" who did not "kiss the ass" of the supervisor did not support an inference
6  of age discrimination because the comment was ambiguous and "could refer [just] as well [to]
7  employees who failed to follow directions as to employees over 40."); *Horn v. Cushman & Wakefield*
8  *Western, Inc.*, 72 Cal. App. 4th 803, 810 (Cal. Ct. App. 1999) (holding that isolated comment "this is
9  1994, haven't you ever heard of a fax before" was "highly ambiguous" and "at most a 'stray' ageist
10 remark . . . entitled to virtually no weight in considering whether the firing was pretextual").
11 Accordingly, the Court finds that plaintiff has failed to raise a triable issue of fact regarding whether
12 plaintiff's termination was impermissibly motivated by age discrimination, and therefore GRANTS
13 summary judgment in favor of defendant as to this claim.

### III.   FEHA retaliation claim

Plaintiff alleges that Thompson retaliated against him in violation of FEHA, arguing that by demoting him and treating his race/age discrimination complaint against Thomson dismissively, the Bank was responsible for the onset of his depression and the subsequent adverse action that was taken against him for his resulting poor performance as a Reverse MLO under Mathe. Compl. ¶¶ 84-86. To establish a *prima facie* case for retaliation, a plaintiff must show (1) he engaged in a protected activity; (2) that his employer subjected him to an adverse action which materially affected the condition of his employment; and (3) that there is a causal link between the protected activity and the employer's adverse action against plaintiff. *See Morgan v. Regents of the Univ. of California*, 88 Cal. App. 4th 52, 69 (Cal. Ct. App. 2000). "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.'" *Id.* (quoting *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988)).

Defendant contends that Adame fails to make a *prima facie* case for retaliation. The Court

1 agrees. Plaintiff did not submit his letter of complaint regarding Thompson's alleged wrongful demotion of him until October 23, 2007, almost a month after stepping down from his position as the San Jose office's sales manager. Plaintiff thus did not engage in a protected activity until after suffering an adverse employment action from Thompson. As a matter of simple logic, plaintiff cannot claim that the Bank retaliated against him for engaging in a protected activity which did not occur until after the adverse action.

Although plaintiff is not entirely clear in his opposition, he also seems to claim that the Bank's adverse action against him was its forcing him to resign as a result of its failure to adequately investigate his discrimination claim. He argues that the dismissal of the investigation caused his depression, which precipitated his subsequently poor job performance, which in turn provided grounds for his alleged forced resignation as a Reverse MLO. Even accepting this as true, the connection between plaintiff's filing of his complaint and his ultimate resignation is too attenuated to constitute a causal link. Almost one year transpired between plaintiff's lodging of his complaint with the Bank in October 2007 and his verbal warning from Mathe in October 2008, and he thus cannot point to any close temporal connection supportive of the inference of retaliation. *See Morgan*, 88 Cal. App. 4th at 69. Moreover, plaintiff alleges no wrongful conduct on the part of Putris or Mathe, and acknowledges that Thompson played no role in the Mathe's progressive disciplinary action against him. Pl.'s Dep. 182:23-184:15.; Thompson Decl. ¶¶ 38-39. Plaintiff thus acknowledges that Mathe legitimately applied the progressive discipline guidelines to him for his failure to meet his sales goals. As a result, he cannot say that his departure was in any way precipitated by Bank of America's response to his complaint against Thompson. Accordingly, the Court GRANTS defendant's motion for summary judgment as to plaintiff's FEHA retaliation claim.

### IV.     **FEHA harassment claim**

Plaintiff alleges a cause of action for harassment and failure to prevent harassment under FEHA with respect to both his age and race. Compl. ¶¶ 75-81. Defendant, however, contends that plaintiff cannot make a *prima facie* case for harassment, and has accordingly moved for summary judgment. To establish a valid harassment claim, a plaintiff must show that his employer subjected him to wrongful

14

treatment "severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive," and that the conduct was directed at him because of his age or race. *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 279 (Cal. 2006). In order to qualify as pervasive, the conduct complained of must extend beyond just a few isolated incidents. *Hughes v. Pair*, 46 Cal. 4th 1035, 1048 (Cal. 2009).

Here, plaintiff's evidence of harassment consists of a handful of comments and actions made and taken by Thompson: (1) her alleged negative discussion of plaintiff's performance in April 2007, prior to becoming his manager; (2) her decision to exclude plaintiff's office from the pilot PFUN program; (3) her allegedly racially offensive admonishment to plaintiff Davis that she "stay in [her] hood;" and (4) Thompson's delivery of plaintiff's initial and final written warnings in August and September 2007, respectively. To establish a hostile work environment, plaintiff must submit evidence of a "concerted pattern of harassment of a repeated, routine and generalized nature." *Aguilar v. Avis Rent A Car System*, 21 Cal. 4th 121, 131 (Cal.1999). Two written counselings threatening termination in the event of failure to improve job performance, the exclusion from a program which only three of fourteen offices in the region were chosen to participate in, a single incident of not shaking his hand, and making a racially insensitive remark to someone other than him, fail to establish such a pattern. Rather, these incidents are both sporadic and isolated. For this reason, the Court GRANTS summary judgment as to plaintiff's harassment and failure to prevent harassment claims.

## V. Defamation

Plaintiff alleges that defendant defamed him after he stepped down to become a MLO, when Thompson allegedly told Stinnett that "[a] monkey could run the [San Jose] office better than [plaintiff]." Adame Dep. at 135:16-136:15, 441:4-442:17. Plaintiff claims to have learned of this statement from Putris, who has testified that he learned of it from Stinnett. However, Thompson denies making the statement, and Stinnett "does not recall" hearing or repeating it, and the Bank accordingly moves for summary judgment on the grounds that the comment is inadmissible hearsay. In the alternative, even accepting the evidence as admissible, defendant argues that the comment was privileged.

15

Defamation constitutes "an injury to reputation; the injury may occur by means of libel or slander." *Shively v. Bozanich*, 31 Cal. 4th 1230, 1232 (Cal. 2003). As this claim does not involve a written communication, libel is not alleged here. *See* Cal. Civ. Code § 45. The Court therefore analyzes Thompson's alleged statement as slander. Slander is defined as a false and unprivileged oral communication/publication that tends "directly to injure [the defamed] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits." Cal. Civ. Code § 46(3); *see also Shively*, 31 Cal. 4th at 1232. To qualify as a "publication," the defendant need not have made the statement to any minimum number of individuals; rather, it is sufficient that the defamatory statement is imparted to a single person other than the plaintiff. *Lundquist v. Reusser*, 7 Cal. 4th 1193, 1203 (Cal. 1994).

On its face, Thompson's comparison of plaintiff to a monkey, if actually made, is defamation per se. *See Mercado v. Hoefler*, 190 Cal. App. 2d 12, 16 (Cal. Ct. App. 1961) (language may be defamatory on its face even though susceptible of an innocent interpretation). Such a statement is both unquestionably demeaning and imputes to him a general professional disqualification well beyond any justifiable bounds. Moreover, although the statement was made to only two people (Stinnett, then Putris) before reaching plaintiff, that is itself sufficient to constitute a publication. Thus, unless the statement is found to be either inadmissible hearsay or privileged, summary judgment at this stage would be inappropriate.

### A. Hearsay

Defendant contends that Adame and Putris' testimony regarding Thompson's allegedly defamatory statement to Stinnett is inadmissible hearsay. Defendant argues that plaintiff submitted Putris' testimony as to Stinnett's alleged out of court statement to prove the truth of the assertion that Thompson compared Adame to a monkey. However, neither plaintiff nor defendant has addressed whether Putris' testimony is taken out of the hearsay rule because it is the statement of a party-opponent. *See* Fed. R. Evid. 801(d)(2)(D) (a statement is not hearsay if it is "made by the [litigation] party's agent

16

or servant concerning a matter within the scope of the agency or employment . . . .").

Putris was a Regional Executive of the Bank, and Stinnett was a Sales Manager. The case law suggests that if Stinnett and Putris had sufficient authority as defendant's agents to speak on its behalf, then the party-opponent exception applies to Putris' testimony. *See, e.g.*, *Coburn v. PN II, Inc.*, No. 09-15837, 2010 WL 1258124, at *3 n.3 (9th Cir. Mar. 10, 2010); *Brewer v. Kmart Corp.*, 5:08-cv-1914, 2010 WL 2346366, at *4 n.5 (C.D. Cal. June 7, 2010). In *Coburn*, the Ninth Circuit considered whether the party-opponent exception could apply to the plaintiff's evidence that the defendant company's executive made a discriminatory comment about her to a vice president, who in turn recounted the statement to plaintiff's supervisor, who then informed plaintiff. The Ninth Circuit found that had the plaintiff submitted the sworn testimony of her supervisor stating that the vice president informed the plaintiff's supervisor of the discriminatory statement, the party-opponent exception would have applied because the vice-president had the authority to make admissions on behalf of the defendant company. *Coburn*, 2010 WL 1258124, at *3 n.3. In *Brewer*, the Court found the party-opponent exception applied to a plaintiff's statement that her Store Manager had told her the Regional Manager had knowledge of plaintiff's protected activity, because the Store Manager was "clearly an agent of defendant Kmart." *Brewer*, 2010 WL 2346366, at *4 n.5.

On this record, the Court cannot conclude that the testimony at issue is hearsay. The Court OVERRULES defendant's objection without prejudice to renewal if, at trial, defendant can demonstrate that the party-opponent exception does not apply.

**B. Privilege**

Defendant also argues that plaintiff's defamation claim fails because Thompson's statement was privileged. In the context of this case, a privileged communication is one made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." Cal. Civ. Code § 47(c). Defendant cites *Lee* v. *Eden Medical Center*, 690 F. Supp. 2d 1011, 1022-23 (N.D. Cal. 2010), for the proposition that an employer's statements to employees who have a work-related interest in

17

knowing the reason for the allegedly defamed individual's termination are privileged. In that case, the court found that a hospital human resources manager was privileged to tell hospital management and counsel that a nurse it formally employed was mentally unbalanced and unfit to be a nurse. *Id.* Defendant argues that the instant case is no different and asserts that because Stinnett was Adame's replacement, he was an "interested party" under § 47(c), and thus any communication regarding Adame's previous management was both innocent and privileged.

However, Adame's case is distinguishable because a statement cannot be deemed privileged if plaintiff can show the statement was made maliciously. *Lundquist*, 7 Cal. 4th at 1212. The Court finds that plaintiff has presented sufficient evidence to raise a triable issue of fact as to whether Thompson acted with malice. As Putris' testimony suggests, Stinnett recounted Thompson's statement to him as though "he couldn't believe she said it to him" and as though "he was shocked." Putris Dep. at 175:20-176:24. Based on this evidence, a jury could reasonably resolve the discrepancy in the plaintiff's favor, and find that (1) Thompson made the statement, (2) that Stinnett had no reason for supposing Thompson's motive to be innocent, and thus (3) that the statement was not privileged. For this reason, the Court DENIES defendant's motion for summary judgment as to plaintiff's defamation claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part. (Docket No. 66).

**IT IS SO ORDERED.**

Dated: August 5, 2010

SUSAN ILLSTON
United States District Judge